# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No.

| | |
|---|---|
| MANDY G. LEIGH,<br><br>Plaintiff,<br><br>vs.<br><br>ROBERTO MARTIN LEIGH,<br><br>Defendant(s). | Case No.:<br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

I, Mandy G. Leigh, plaintiff, in the above styled cause, sue defendant, Roberto Martin Leigh, and allege as follows:

## THE PARTIES

1. Plaintiff Mandy G. Leigh is, and was at all times relevant herein, a resident within the County of Marin, State of California. M. Leigh is barred in the State of California, having attended high school, college and law school in the State of Florida.

2. Defendant Roberto Martin Leigh is, and was at all times relevant herein, a resident within the County of Broward, State of Florida.

1

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of the claims in this Complaint pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) as plaintiff is a resident of the State of California and Defendant a resident of the State of Florida. The amount in controversy exceeds $75,000.

4. Venue is proper within this judicial district pursuant to 28 U.S.C. §§ 1391(b)(2) and (c) because Defendant is a resident within the jurisdictional limits of the Southern District of Florida or is considered a resident of this judicial district for the purposes of venue.

## ALLEGATIONS

5. In March of 2022, Mandy G. Leigh ("M. Leigh") learned that her father, Norman Leigh ("N. Leigh"), then 86 years old and a long-time resident of Broward County, Florida, had suffered a fall at home that resulted in significant bruising to his head. While he required medical care, M. Leigh's mother, Silvia Leigh ("S. Leigh"), refused to take N. Leigh for medical care nor to allow "her"[1] insurance to be used for his required medical care.

6. At this same time, M. Leigh learned from her sister Jennifer Leigh ("J. Leigh") that her father was emaciated and unkempt due to S. Leigh's refusal to allow him any money to feed or otherwise care for himself.

---

[1] The medical insurance was actually joint medical insurance but S. Leigh, who is 10 year's younger than N. Leigh, controlled both the couple's money (including N. Leigh's social security and pension that she moved to her own accounts in violation of federal law) and insurance information.

7.     Despite the fact that M. Leigh's brother, Roberto Martin Leigh ("R. Leigh") lived in close proximity to his parents, he failed to intervene in order to improve N. Leigh's condition by getting him medical care or adequate nutrition, claiming that "[S. Leigh] is the boss."

8.     Consequently, M. Leigh stepped in and developed a plan to get N. Leigh to an assisted living facility (ALF) and long overdue medical care and attention, sell the family home, and purchase a condominium for her mother to reside.

9.     M. Leigh, from California, arranged for a real estate agent to list and then sell the family home, to find a condominium for S. Leigh to purchase, and to arrange proper medical care for N. Leigh by obtaining his own insurance and finding an appropriate ALF.

10.    In order to effectuate the move and to develop a plan for payment for an ALF for N. Leigh and to protect the assets, M. Leigh found an estate planning attorney to advise as to the best way to proceed, at which point M. Leigh was made durable power of attorney (DPA) over S. Leigh and N. Leigh's healthcare and finances. R. Leigh was apprised of the decision of his parents to appoint M. Leigh as DPA at that time.

11.    M. Leigh kept her siblings apprised of all these developments and documented each step moving forward. R. Leigh was only happy to have M. Leigh do the heavy lifting of coordinating these significant life moves from California, with R. Leigh telling J. Leigh, just let M. Leigh handle it.

12.    Initially, M. Leigh had no understanding of her parents' assets other than she thought them to be minimal. Consequently, M. Leigh loaned[2] her mother $120,000 for the purchase of the condominium along with additional funds for the purchase of furnishings for the condominium. These funds were advanced so that S. Leigh could move into the condominium

---

[2] No interest or any other amount was charged by M. Leigh.

with the least amount of burden while the house was being sold. M. Leigh was eventually paid back in full from the sale of the house, accounted for all remaining funds from the sale to S. Leigh, R. Leigh and J. Leigh, and deposited the balance of funds into an account for the benefit of S. Leigh.

13. R. Leigh also advanced very small amounts to assist N. Leigh in a move from one ALF to another. R. Leigh made demands for immediate payment of de minimus amounts such as approximately $140 for a Walmart (or similar) purchase after texting receipts to M. Leigh. When M. Leigh requested that R. Leigh email receipts rather than simply texting them, as would be required if he was dealing with a professional fiduciary, he became unhinged, verbally attacked M. Leigh on telephone calls, calling her various names including the "C" word and claiming he and his family would be put out on the street if he was not immediately reimbursed for the $140 Walmart purchase.

14. After being made DPA, M. Leigh was also made trustee of a revocable trust which was recommended by the trust and estate planning attorney for S. Leigh. As part of that process, M. Leigh, as trustee and DPA, was required to locate and marshal the assets for proper management, since S. Leigh had only a rudimentary understanding of the assets. M. Leigh, with the knowledge and participation of S. Leigh, asked her husband, an attorney licensed in California with some experience in trust matters, to assist in identifying the assets listed in a cryptic email from S. Leigh which listed some specific CD investments and a number of financial institutions without any indication of the type or amount of assets held by those financial institutions.

15. With the explicit knowledge, consent and assistance of S. Leigh, M. Leigh and her husband were able to access statements for the remaining assets identified in the cryptic email. M. Leigh then provided that information to S. Leigh's financial advisor for over 25 years at

Morgan Stanley in order to develop a comprehensive strategy for managing the assets, which were invested in vehicles that were overly aggressive for an elderly person.

16. M. Leigh did not charge anything or take any benefit from serving as trustee and took no steps other than to begin to move some assets into the revocable trust for eventual management by Morgan Stanley.

17. During this period of time, in the summer of 2022, R. Leigh, was having more money problems than normal (he has always had or claims to have had money problems) due to the purchase of a used pickup truck for his son, without an adequate inspection, or service warranty, that turned out to have significant mechanical problems.

18. On information and belief, R. Leigh became paranoid or angry, or both, that his sister M. Leigh was named as trustee. R. Leigh also learned that the amount of assets at issue were significantly more than any of the siblings, and perhaps even S. Leigh, had suspected.

19. Thereafter, R. Leigh began a campaign of undue influence and outright lies to manipulate S. Leigh to make him DPA so that he would be in control of the newly-found assets.

20. R. Leigh claimed, falsely, that M. Leigh and her husband had stolen money from S. Leigh as follows:

    a. In or around September 2022, R. Leigh falsely stated to his cousin that M. Leigh had stolen money from S. Leigh. The cousin then called J. Leigh and stated "your brother is trying to get in touch with you … M. Leigh is stealing from your parents . . . he wants you to call him." J. Leigh contacted R. Leigh who made false statements that M. Leigh and her husband were stealing money from their parents. R. Leigh was concerned M. Leigh's husband had bank information and had access and said "think about it Jenny …think about it why would [he] need access?" Robert further made false claims that M. Leigh and her husband were wrongfully

charging for their time and M. Leigh was wrongfully charging for "legal services," implying that she was engaging in the unlicensed practice of law. R. Leigh was angry at M. Leigh and falsely claimed that M. Leigh removed Silvia's name from undisclosed "bank accounts" without telling anyone. R. Leigh encouraged J. Leigh to call other family members[3] and to file a bar complaint against M. Leigh with the State Bar of California and she did so. J. Leigh later dismissed the complaint after the State Bar of California reached out to her and after learning that all of R. Leigh's claims were designed to have J. Leigh side with him in his attempts to take over as Power of Attorney and control their parents' money. J. Leigh has since reviewed emails, documents and spoken with M. Leigh to learn that R. Leigh's claims are false. The State Bar of California never proceeded with any investigation of M. Leigh.

      b.      Upon information and belief, during the summer of 2022, and into September of 2022, and thereafter, R. Leigh made false statements to S. Leigh to the effect that M. Leigh was stealing her money. These false statements caused S. Leigh to remove M. Leigh as trustee and DPA and for R. Leigh to be substituted as DPA and, presumably, trustee. In or around September 2022, M. Leigh sent a text message and other communications to R. Leigh asking him to cease and desist from the ongoing false statements that M. Leigh was stealing. R. Leigh ignored these requests. The allegations in this subparagraph will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

      c.      In or around the fall of 2022, R. Leigh falsely published to attorneys for his mother that M. Leigh had stolen some unclear sum from his mother, on information and belief, believed to be the sum of $400,000. Those attorneys then published to attorneys for N. Leigh

---

[3] J. Leigh called her sister in London and advised that R. Leigh said M. Leigh was "stealing" and he had proof.

that M. Leigh had "removed some $400,000 …without permission" and that these funds had been "taken" without the knowledge of N. Leigh or S. Leigh.  This was all demonstrably false. To date, the attorneys have not mentioned further word regarding these allegations given there is no documentary or any other evidence of funds being "taken," stolen, misappropriated or any other form of mis- or self-dealing. The allegations in this subparagraph, or some of them, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

        d.       In or around the winter of 2022 or spring of 2023, R. Leigh falsely stated to another cousin that M. Leigh had stolen money from their parents to buy her daughter a car. Instead, M. Leigh and her husband bought their daughter a car, along with an extended service warranty, with their own funds.

        e.       On information and belief, R. Leigh has falsely stated from the fall of 2022 through the present, or implied to others, including other family members, friends, acquaintances and potentially others, that M. Leigh has stolen or otherwise wrongfully appropriated assets from her parents.   The allegations in this subparagraph, or some of them, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

        21.       As a direct and proximate cause of R. Leigh's false statements, the family has become embroiled in a regrettable dispute, although it has been intentionally created by R. Leigh. R. Leigh, since becoming DPA over his mother's assets, has refused, or manipulated his mother to refuse, to pay for any amounts to support his father, N. Leigh's care, despite the fact that significant marital assets exist to pay for N. Leigh's care. As a result, M. Leigh has had to pay for shortfalls between N. Leigh's modest social security payments and small pension for serving in the British Royal Air Force and his rent at the ALF, lest he be evicted and become

homeless. M. Leigh also funds all of N. Leigh's care, medical, living expenses and other needs due to R. Leigh's conduct and the repercussions therefrom.

22. N. Leigh, after learning he was receiving no financial support despite significant marital assets (which included years and years of his social security and pension payments being secreted to an account only in S. Leigh's name) and after suffering for years from abusive conduct by S. Leigh, filed for divorce.

23. Immediately after the divorce filing, R. Leigh filed for guardianship[4] over N. Leigh to stop the divorce and subsequent equitable division of the assets, falsely claiming that his own father was incompetent to assent to divorce despite R. Leigh's knowledge of years of abuse by S. Leigh against N. Leigh. N. Leigh is highly competent despite his age (his father lived to 99 and was competent well into his 90s), independently desires a divorce on the basis of principle but also so he can support his care in his final years. M. Leigh has had to incur attorney's fees as a result of the guardianship filing.

24. On information and belief, according to statements made by family members, R. Leigh's false and defamatory representations have manipulated S. Leigh to disinherit M. Leigh and J. Leigh from her will, causing approximately $850,000 in damage to M. Leigh. The allegations in this subparagraph will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

**FIRST CAUSE OF ACTION – DEFAMATION PER SE**

25. M. Leigh incorporates and re-alleges the allegations in Paragraphs 1-24 as though fully set forth herein.

---

[4] R. Leigh initially sought a temporary emergency guardianship which was almost immediately dropped as there was no evidence to support the filing.

26. Defendant, R. Leigh published the following defamatory statements:

a. In or around September 2022, R. Leigh falsely stated to his cousin that M. Leigh had stolen money from S. Leigh. The cousin then called J. Leigh and stated "your brother is trying to get in touch with you … M. Leigh is stealing from your parents . . . he wants you to call him". J. Leigh contacted R. Leigh who made false statements that M. Leigh and her husband were stealing money from their parents. R. Leigh was concerned M. Leigh's husband had bank information and had access and said "think about it Jenny …think about it why would [he] need access?" Robert further made false claims that M. Leigh and her husband were wrongfully charging for their time and M. Leigh was wrongfully charging for "legal services," implying that she was engaging in the unlicensed practice of law.   R. Leigh was angry at M. Leigh and falsely claimed that M. Leigh removed Silvia's name from undisclosed "bank accounts" without telling anyone. R. Leigh encouraged J. Leigh to call other family members[5] and to file a bar complaint against M. Leigh with the California bar and she did so. J. Leigh later dismissed the complaint after the California Bar reached out to her and after learning that all of R. Leigh's claims were designed to have J. Leigh side with him in his attempts to take over as Power of Attorney and control their parents' money. J. Leigh has since reviewed emails, documents and spoken with M. Leigh to learn that R. Leigh's claims are false. The California Bar never proceeded with any investigation of M. Leigh.

b. Upon information and belief, during the summer of 2022, and into September of 2022, and thereafter, R. Leigh made false statements to S. Leigh to the effect that M. Leigh was stealing her money. These false statements caused S. Leigh to remove M. Leigh as trustee and

---

[5] J. Leigh called her sister in London and advised that R. Leigh said M. Leigh was "stealing" and he had proof.

DPA and for R. Leigh to be substituted as DPA. The allegations in this subparagraph will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

  c. In or around the fall of 2022, R. Leigh falsely published to attorneys for his mother that M. Leigh had stolen some unclear sum from his mother, on information and belief, believed to be the sum of $400,000. Those attorneys then published to attorneys for N. Leigh that M. Leigh had "removed some $400,000 …without permission" and that these funds had been "taken" without the knowledge of N. Leigh or S. Leigh. This was all demonstrably false. To date, the attorneys have not mentioned further word regarding these allegations given there is no documentary or any other evidence of funds being stolen, misappropriated or any other form of mis- or self-dealing. The allegations in this subparagraph, or some of them, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

  d. In or around the winter of 2022 or spring of 2023, R. Leigh falsely stated to another cousin that M. Leigh had stolen money from his parents to buy her daughter a car. Instead, M. Leigh and her husband bought their daughter a car, along with an extended service warranty, with their own funds.

  e. On information and belief, R. Leigh has falsely stated or implied to others, including other family members, friends, acquaintances and potentially others, that M. Leigh has stolen or otherwise wrongfully appropriated assets from her parents. The allegations in this subparagraph, or some of them, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

  27. Each of the statements made in subparagraphs 26a-e were false.

  28. Each of the statements made in subparagraphs 26a-e were defamatory *per se* in that they either (a) accuse Plaintiff of an infamous crime, e.g., larceny; (b) tend to subject

Plaintiff to hatred, distrust, ridicule, contempt or disgrace; or, (3) tend to injure Plaintiff in her trade or profession.

29. As a result, damages are presumed; however, as a direct and proximate result of the defamatory statements, Plaintiff has suffered damages including paying the costs of her father's care; incurring attorney's fees; and, loss of inheritance.

## JURY TRIAL

30. Plaintiff demands a jury trial on all issues for which a jury is afforded by right.

WHEREFORE, plaintiff prays as follows:

1. For presumed damages in excess of $850,000;
2. For special damages in excess of $50,000 for payment of expenses for N. Leigh and attorneys' fees incurred in the related litigation;
3. For punitive damages;
4. For costs of suit;
5. For such other and further relief as the Court deems appropriate.

Dated: April 28, 2023

Respectfully submitted,

BRUCE H. FLEISHER, P.A.
2665 South Bayshore Drive
Grand Bay Plaza – Suite 220
Tel.: (305) 859-7999
Email: Bruce@BruceFleisherLaw.com

By: /s/ Bruce H. Fleisher
Bruce H. Fleisher, Esq.
Florida Bar No.: 166952